UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMITIE ONE CONDOMINIUM ASSOCATION, | : : | |
| Plaintiff | : : | NO.: 1:07-CV-01756 |
| v. | : : | (JUDGE CONNER) |
| | : | (MAGISTRATE JUDGE PRINCE) |
| NATIONWIDE PROPERTY & CASUALTY INSURANCE COMPANY, | : : : | |
| Defendant | : : | |

## **REPORT AND RECOMMENDATION**

Pursuant to an Order entered on August 3, 2010 (Doc. 71), Honorable Christopher Conner referred the parties' pending motions for summary judgment (Docs. 49, 59) to the undersigned Magistrate Judge.

## **I. Background**

This case is a dispute over whether defendant Nationwide Property & Casualty Insurance Company (Nationwide) properly denied the insurance claim of plaintiff Amitie One Condominium Association (Amitie One). Amitie One is the homeowner's association for a condominium complex that Nationwide insures; when the complex suffered damage from subsidence of the underlying land, Amitie One sought coverage under its policy, but Nationwide took the position that the damage fell under an exclusion in the policy. Amitie One then commenced this lawsuit, claiming breach of contract and bad faith in the denial of coverage, and seeking a declaratory judgment that Nationwide owes it coverage.

## (A) Facts of the case

The following facts are drawn from the parties' statements of facts and related documents accompanying their motions for summary judgment. Unless otherwise stated, these facts are not in dispute.

The members of plaintiff Amitie One, a nonprofit Pennsylvania corporation, are the title owners of condominium units at or near 801 Stratford Drive, in State College, Pennsyvlania. (Doc. 61. ¶¶ 2, 4.) Defendant Nationwide is an Ohio corporation with a principal place of business in Columbus, Ohio. (*Id.* ¶ 3.) As authorized by Pennsylvania's Department of Insurance, Nationwide issues insurance policies within the Commonwealth of Pennsylvania. (*Id.* ¶ 7.)

Nationwide insured Amitie One under a Business Provider Insurance Policy. (Doc. 51, ¶ 1.) The subject property that the policy insures is a three-story, multifamily residential building that was erected in 1974. (*Id.* ¶ 7.) In addition to the general statement of coverage that provides for insurance against "risks of direct physical loss" (Policy pt. A(3), Doc. 50, at 44), the policy states that Nationwide "will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building" (*Id.* pt. A(5)(d), at 45). Specifically excluded from the policy's coverage is "earth movement," which is defined as "[a]ny earth movement (other than sinkhole collapse)." (*Id.* pt. B(1)(b), at 48.)

The record contains evidence of structural problems at the condominium complex as far back as late 1992. Plaintiff's geotechnical and structural engineering consultant, CMT Laboratories, Inc., wrote a letter dated October 28, 1992, which refers to a visit to the complex on October 6. (Doc. 51, at 28.) The letter noted that as of the visit, there was a vertical crack in the east wall of one of the complex buildings, Building 801. (*Id.*) From that point through 1994, Amitie One undertook investigation and remediation efforts in response to this and other structural damage. (Doc. 51, ¶¶ 8–21; Doc. 55, ¶¶ 8–21.)

2

Whether the manifested damage beginning in 1992 would be more accurately described as "discrete" with a "rapid onset," on the one hand, or as part of an "ongoing and continuous" series of structural problems, on the other, is a matter of intense dispute between the parties, at least in the briefs submitted to the Court. (Doc. 61, ¶ 19; Doc. 67, ¶ 19.) A June 2006 letter from CMT Laboratories referred to "continued settlement"; a September 2006 letter discussed the "continued distress on the building structure" and opined that the building "will continue to move." (Doc. 54-5, at 9; Doc. 51, at 51.) Mark Suchecki of Plick and Associates, who served as Nationwide's forensic engineer, wrote a report on the condominium damage in December 2006. This report spoke of the 2006 damage as "the same cracks and settlement noted in 1994" that, rather than having geologically distinct causes, had merely "increased in severity." (*Id.* at 54.) Jesse Smith, one of CMT's engineers, noted that tests conducted in 2006 revealed that the "structural distress" experienced in 1994, although previously thought to be the result of poor construction fill, was actually the result of "a karst (carbonated bedrock) instability and the formation of a sinkhole." (Smith Aff., Doc. 54-4, at ¶ 11.) Shad Hoover, one of Smith's colleagues at CMT, affirmed the same. (Hoover Aff., Doc 54-5, at ¶ 12.) Hoover also mentioned the "continued migration of soil and materials into subsurface voids." (*Id.* at ¶ 13.)

Also disputed, at least nominally, is whether structural problems persisted from 1994 to 2006 (Doc. 61, ¶¶ 38–39; Doc. 67, ¶ 38), but the parties seem mostly to agree that additional occurrences of structural problems did happen in 2005 and 2006 (Doc. 51, ¶ 23; Doc. 45, ¶ 22; Doc. 61, ¶ 39). Residents described some of the damage they observed (Docs. 57-8, 57-9); in late 2006, Nationwide's engineer, Suchecki, documented the damage to the complex (Doc. 57-16, at 4-5). The damage was localized to the 801 Building on Stratford drive, specifically the parts of the building that contained Units 13, 14, 15, and 16. (*Id.* at 2, 6, 8.) Amitie One directed CMT Laboratories to assess the

3

property. (Doc. 61, ¶ 42; Doc. 67, ¶ 52.) CMT Laboratories discovered sinkhole activity (Doc. 61, ¶ 43; Doc. 67, ¶ 43, Doc. 51, at 51), and Suchecki, reviewing CMT's report, likewise concluded that the damage to the complex was the result of sinkhole activity (Doc. 57-16, at 9). CMT Laboratories concluded that "the building will continue to move due to the underlying karst-related instability" (Doc. 51, at 51); Suchecki concluded that it would be "necessary to stabilize the condition to prevent further damage to the building" and that it would be "prudent . . . to stabilize the rear foundation and the soil upon which it bears" (Doc 57-16, at 9).

Amitie One filed a claim for coverage under the insurance policy with Nationwide in May 2006. (Doc. 61, ¶ 48; Doc. 67, ¶ 48.) Kathy Burgan, a claims adjuster for Nationwide, denied the claim in somewhat tentative terms on July 6, 2006. (Doc. 57-3, at 3.) Her denial letter made reference to her receipt of a comprehensive report from Amitie One's engineering consultant. (*Id.* at 2.) Subsequently, Amitie One's claim was reassigned to another adjuster, David Porter, who issued an unequivocal denial letter on March 5, 2007. (Doc. 57-13.)

### (B) Procedural history

This case has its origins in the Court of Common Pleas of Centre County, Pennsylvania, where plaintiff filed a complaint on September 7, 2007. (Doc. 1-6, at 13.) The complaint included claims for breach of contract and bad-faith denial of insurance coverage, and sought a declaratory judgment that plaintiff's insurance claim was within the insurance policy. (*Id.*) Shortly thereafter, on September 26, defendant removed the case to federal court, invoking diversity jurisdiction under 28 U.S.C. § 1332. (Doc. 1, ¶ 5.) It quickly followed on October 3 with a motion to dismiss. (Doc. 3.) After briefing from both parties (Docs. 4, 8, 9), the Court denied defendant's motion (Doc. 17), indicating that the dispute revolved around the meaning of the contractual terms "land,"

"risks of direct physical loss involving collapse," and "sudden," and that the parties had yet to have a chance to present evidence about how these terms are used in the insurance industry (*id.* at 7).

Following the denial of its motion to dismiss, defendant answered the complaint on November 14, 2008. (Doc. 20.) On October 6, 2009, defendant filed a motion to sever (Doc. 31), asking the Court, among other things, to hear plaintiff's declaratory-judgment action first. After briefing from the parties (Docs. 32, 35, 37), on March 22, 2010, the Court granted defendant's motion to the extent that it sought adjudication of the declaratory-judgment action first, denying it otherwise (Doc. 43). Meanwhile, plaintiff had sought leave to amend or correct its complaint (Doc. 33), which generated its own host of briefs supporting and opposing (Docs. 34, 36, 38), and which the Court also granted on March 22 (Doc. 44). Plaintiffs filed their amended complaint the same day (Doc. 45), which the defendants answered on April 5 (Doc. 47). The Court ordered dispositive motions on the declaratory-judgment action to be filed by July 20, 2010. (Doc. 46.)

On June 11, 2010, defendant filed a motion for summary judgment (Doc. 49) and an accompanying statement of facts (Doc. 51); plaintiff filed its cross-motion for summary judgment and its statement of facts (Doc. 59, 61) on July 15, 2010. All parties timely submitted supporting documents and briefs in support, in opposition, and in reply on all motions. (Docs. 50, 52–58, 60, 62, 67–70, 72) Both parties' motions are ripe for adjudication.

**II. Standard of Review**

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

5

law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the

6

nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## III. Discussion

*(A) Standard for interpretation of insurance policies*

Canons of construction for insurance polices are well established. The interpretation of an insurance policy is solely a question of law within the court's province. *Geisler v. Motorists Mut. Ins. Co.*, 556 A.2d 391, 393 (Pa. Super. 1989) (citing *Winters v. Erie Ins. Group*, 532 A.2d 885, 887 (Pa. Super. 1987)). In reading the contract language, a court's "focal point" is the "insured's reasonable expectations," *id.*, with the broader goal of "ascertain[ing] the intent of the parties as manifested by the terms used in the written insurance policy," *401 Fourth St., Inc. v. Investors Ins. Group*, 879 A.2d 166, 171 (Pa. 2005) (citing *Gene & Harvey Builders, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986)). Courts must examine the "entire [insurance-policy] transaction," not just the clauses being interpreted. *Everett Cash Mut. Ins. Co. v. Krawitz*, 633 A.2d 215, 217 (Pa. Super. 1993). The policy must be construed so as to give effect to all of its provisions; a proper interpretation will not leave "any part of it useless and unnecessary." *Telecomm. Network Design, Inc. v. Brethren Mut. Ins. Co.*, 83 Pa. D. & C.4th 265, 275 n.29 (Pa. Com. Pl. 2007) (quoting *Mut. of Omaha Ins. Co. v. Bosses*, 237 A.2d 218, 220 (Pa. 1968)).

The terms of the insurance policy must be given their "plain and proper meaning" whenever possible. *Monti v. Rockwell Ins. Co.*, 450 A.2d 24, 25 (Pa. Super. 1982) (citing *Ranieli v. Mut. Life Ins. Co. of Am.*, 413 A.2d 396 (Pa. Super. 1979)). If a word or phrase is specifically defined in the policy, that definition controls. *Peerless Dyeing Co. v. Indus. Risk Insurers*, 573 A.2d 541, 544 (Pa. Super. 1990). If a contractual term is undefined, and has no single "plain and proper meaning" such that the term is "reasonably

7

susceptible of different constructions and capable of being understood in more than one sense," then it may be considered ambiguous. *401 Fourth St.*, 879 A.2d at 171 (quoting *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)). However, "the mere fact that the parties do not agree upon the proper construction" of a term does not render the term ambiguous. *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 364 (3d Cir. 2004) (quoting *State Farm Fire & Cas. Co. v. MacDonald*, 850 A.2d 707, 710 (Pa. Super. 2004)). But if a genuine ambiguity arises, it is to be resolved in favor of the insured. *401 Fourth St.*, 879 A.2d at 171 (citing *Gene & Harvey Builders, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986)). Resolving in the insured's favor not only furthers "the contract's prime purpose of indemnification," but also follows the general rule that contractual ambiguities are to be construed against the drafter, *Lane v. Commonwealth*, 2008 PA Super. 157, ¶ 7 (citing *Bucks Orthopaedic Surgery Assocs., P.C. v. Ruth*, 925 A.2d 868, 871 (Pa. Super. 2007)), and recognizes that insurance polices are generally contracts of adhesion in which the insured has little or no bargaining power, indicating that the insurance policy should be construed strictly against the insurer, *Burton v. Republic Ins. Co.*, 2004 PA Super. 67, ¶ 28 (citing *Ferguson v. Lakeland Mut. Ins. Co.*, 596 A.2d 883 (Pa. Super. 1991)).

### *(B) Insurance-policy provisions applicable in this case*

Plaintiff seeks to have the structural damage to its condominium complex covered under its insurance policy with defendant. Defendant seeks to establish that the damage falls within the "earth movement" exclusion. The relevant provisions of the policy are:

> A. **COVERAGE**
> We will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss.
>
> . . . .

3. **Covered Causes of Loss**
RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
a. Excluded in Section B., Exclusions . . .

. . . .

5. **Additional Coverages**

. . . .

   d. **Collapse**
   We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:

      (1) The "specified causes of loss" or breakage of building glass, all only as insured against in this policy;

   . . . .

   Collapse does not include settling, cracking, shrinkage, bulging or expansion.

   . . . .

**B. EXCLUSIONS**
1. We will not pay for loss or damage caused directly or indirectly by any of the following. . . .

. . . .

   b. **Earth Movement**
   (1) Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. . . .

      . . . .

**H. PROPERTY DEFINITIONS**

. . . .

> 6. **"Specified Causes of Loss"** means the following:
> Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.
>
>> a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. . . .

(Doc. 50, at 43–45, 48, 57–58.)

*(C) Plaintiff's prima facie case*

It is incumbent upon the claimant–plaintiff to show that the "claim is within the coverage provided by the policy." *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966) (quoting *Warner v. Employers' Liability Assurance Corp.*, 133 A.2d 231 (1957)). If the plaintiff makes this showing, the burden shifts to the defendant to establish the affirmative defense that the claimed loss falls within an exclusion or exception. *Miller*, 218 A.2d at 277 (citing, *e.g.*, *Bowers v. Great E. Cas. Co.*, 103 A. 536 (Pa. 1918)).

    The threshold issue in determining the substance of plaintiff's prima facie case is the question of whether the insurance policy is an "all risks" policy. Plaintiff maintains that it is, and refers to defendant's statement of facts supporting its motion for summary judgment. (*See* Doc. 51, ¶ 2 (containing defendant's averment that their policy "provides coverage for all risks of loss or damage to the property that are not limited or excluded"); Doc. 55, ¶ 2 (containing plaintiff's admission that the policy is an all-risks policy); Doc. 50, at 43–44 (providing that defendant will pay for damage to covered property caused by "any Covered Cause of Loss," which includes "risks of direct physical loss" unless excluded or limited).) To characterize the policy as an "all risks" policy would have substantial consequences: for an all-risks policy, all plaintiff need do in its prima facie case is establish that the covered property suffered some kind of "fortuitous" damage.

10

*Miller*, 218 A.2d at 279 (quoting *Balogh v. Jewelers Mut. Ins. Co.*, 167 F. Supp. 763 (S.D. Fla. 1958), *aff'd*, 272 F.3d 889 (5th Cir. 1959)) ("It would seem that all plaintiff need show in such a case is a loss, since losses from all causes are covered.") The burden would then shift to defendant to establish applicability of an exception—which, here, would mean showing that the condominium complex suffered damage from an event that (a) can be characterized as "earth movement" and (b) was not "sinkhole collapse." However, if the policy is not an all-risk policy, plaintiff's prima facie case would carry a much greater burden of proof. Rather than having the benefit of a virtual presumption of coverage, plaintiff would need to affirmatively demonstrate coverage. In this case, plaintiff would have to show (1) that the "loss or damage" was "caused by or result[ed] from risks involving collapse of . . . any part of a building" which was, in turn, (2) caused by a sinkhole collapse, which is "the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite." (Policy pts. A.5.d.(1), H.6.a, Doc. 50, at 45, 57–58.) Only after making this showing would defendant need to prove that the event causing damage was some kind of excluded "earth movement."

But the insurance policy at issue in this case cannot be considered an all-risks policy. If the policy were all-risks, the entirety of Part A.5, "Additional Coverages," would be unnecessary verbiage. (Doc. 50, at 44–45.) If the policy were intended to cover all damage to the subject property unless specifically excluded, there would be no reason to enumerate particular causes of damage that are within the policy's coverage. Holding the policy to be an all-risks policy would violate one of the basic rules of contractual interpretation; Part A.5 cannot be rendered useless. *See Mut. of Omaha Ins. Co. v. Bosses*, 237 A.2d 218, 254 (Pa. 1968) (citing *Galvin v. Occidental Life. Ins. Co. of Cal.*, 211 A.2d 120 (Pa. Super. 1965)) (requiring insurance policies to be construed "in such a manner as to give effect to all of [their] provisions and forbidding an interpretation that "render[s]

11

any part . . . useless and unnecessary"). Defendant's averment that the policy is an all-risks policy is not a binding admission of fact; it is a conclusion of law that the Court need not consider in its own determination. Accordingly, plaintiff has the affirmative burden of demonstrating coverage as part of its prima facie case before defendant must prove applicability of an exclusion.

Thus, plaintiff must show that the damage to the condominium complex was caused by "risks of direct physical loss involving collapse" of all or part of the complex, such risks being the result of sinkhole collapse.

(1) "Risks of direct physical loss involving collapse"

Plaintiff rightly indicates that the language at issue here, more than just the word "collapse," is the whole operative phrase in the policy: "risks of direct physical loss involving collapse." The Pennsylvania Supreme Court has found this exact phrase to be "reasonably susceptible of different constructions . . . and thus is ambiguous." *401 Fourth St., Inc. v. Investors Ins. Group*, 879 A.2d 166, 174 (Pa. 2005). Invoking the rule that ambiguous insurance-policy provisions should be strictly construed against the insurer–drafter, the *401 Fourth Street* court held this phrase to insure against "damage caused by the falling down, or imminent falling down[,] of a building or part thereof." *Id.* However, the court took care to note that interpreting the phrase to cover "substantial impairment of structural integrity" would be "too distant from the concept contained in [the] existing case law[,] which requires the falling of the building" and would run the risk of "convert[ing] the policy into a maintenance agreement by permitting recovery for damage [that, although] substantial, does not threaten collapse of the structure." *Id.* (citing *Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co.*, 565 S.E.2d 306, 308 (S.C. 2002)). The *401 Fourth Street* court thus did not disturb the long-settled definition of "collapse" used in Pennsylvania, which is understood to mean "to fall

together" or "to fall together suddenly." *Skelly v. Fidelity & Cas. Co.*, 169 A. 78, 79 (Pa. 1933) (citing 2 Words & Phrases, First Series, at 1248); *accord Kattelman v. Nat'l Union Fire Ins. Co.*, 202 A.2d 66, 67 (quoting *Skelly*, 169 A. at 79).

The two cases that plaintiff cites in support of the notion that "collapse" is an ambiguous term are unpersuasive. One is an unpublished 1995 decision from the Eastern District of Pennsylvania, which involved an interpretation of Pennsylvania state law not binding on this Court, and which predated the *401 Fourth Street* decision, which, to reiterate, did not disturb the definition of "collapse." *Egan v. Am. & Foreign Ins. Co.*, 1995 WL 734105, No. 95-4193 (E.D. Pa. Dec. 5, 2005). The other case, which held ambiguous an insurance-policy clause regarding sinkhole formation, did so on the basis of the phrase "the action of water on limestone or *similiar rock formations*," which is language not present in the insurance policy at issue here. *Betz v. Erie Ins. Exch.*, 2008 PA Super. 221, ¶¶ 8, 12 (emphasis added). Neither *Egan* nor *Betz* affect the analysis in the case at bar.

Under the controlling case law, then, plaintiff must establish that all or part of the condominium complex had either fallen down or was at risk of imminently falling down. Plaintiff has not made this showing. It is undisputed that the 801 Building, specifically the part that contains Units 13, 14, 15, 16, has suffered structural damage, but plaintiff has neither made an averment nor submitted an exhibit that demonstrates that any part of the 801 Building is at risk of imminently falling down. Although the engineering consultants for both plaintiff and defendant agree that the damage observed in 2006 made structural repairs necessary, the goal was to avoid further damage, not imminent falling down. Plaintiff has thus failed to show that its claim is within the policy language that covers "collapse." (Policy pt. A.5.d (Doc. 50), at 45.)

(2) Sinkhole collapse

The insurance policy defines "sinkhole collapse" as "the sudden sinking or collapse of land into underground empty spaces by the action of water on limestone or dolomite." (Policy pt. H.6.a, Doc. 50, at 58.) There is no dispute in this case that sinkhole *activity* has taken place; the parties agree that there has been sinking or collapse of land into underground empty spaces. The dispute is over whether the sinking or collapse was *sudden*. Plaintiff, in arguing suddenness, points out that "sudden" is not defined in the policy and suggests that "sinkhole collapse" is defined in terms of "the formation of [the] sinkhole itself," an "inherently illusory" definition. (Doc. 56, at 18 & n.7.)

First, the definition of "sinkhole collapse" plainly refers to the rate of collapse, not the formation of the subterranean voids that collapse. Second, "sudden" is a commonly used word that admits of a common-usage definition: according to Merriam-Webster, "sudden" means "happening or coming unexpectedly" or "marked by or manifesting abruptness or haste." There may come a case in which further probing of terms like "unexpectedly" or "manifesting abruptness" may be necessary, but this is not such a case.

Plaintiff vehemently insists in its brief and in accompanying statements of fact that the structural damage that the 801 Building suffered in 1992–1994 and 2005–2006 were distinct, separated by a definite interval of time, and were both characterized by a sudden onset. But plaintiff's own records, and the affidavits of its own witnesses, belie the facts as stated in its formal submissions to the Court. A letter authored in September 2006 by CMT Laboratories, plaintiff's geotechnical engineering consultant, noted that the remediation work done in 1994 proceeded on the belief that the structural damage was the result of bad construction fill. (Doc. 51, at 51.) Those remedial efforts "should have been successful in arresting movement of the structure if the problem was related only to compressible soils or fill materials." *Id.* The failure of the remediation "suggest[ed] that a deeper source of instability [was] responsible," namely, an "underlying karst related

instability"—not just for the 2005–2006 damage, but for the 1992–1994 damage as well. CMT opined that as of September 2006, "a sinkhole *is forming* in the vicinity of the structure" and "the building *will continue* to move" due to the underlying instability. (*Id.* (emphasis added)). Two of CMT's engineers submitted affidavits saying essentially the same thing. Residents also submitted affidavits describing the damage. One resident, Larry Newman, stated that he saw damage "[b]eginning in November 2005." (L. Newman Aff. (Doc. 57-8), ¶ 4.) Newman stated that the "onset of [the] problems was very rapid," but that the "cracking and gaps . . . would lengthen from one visit to the next," with no indication that the cracking and gaps ever stopped worsening. (*Id.* ¶ 10.) His wife, Cynthia, submitted a substantially identical affidavit. (C. Newman Aff (Doc. 57-9).)

Plaintiff's own consultant, CMT Laboratories, stated that the damage in 2005–2006 was causally connected to the problems experienced as long before as 1992, and CMT's observation of "continued distress" and statement that "the building will continue to move" (Doc. 51, at 51) are indicative of an ongoing and gradual collapse, not a sudden one. Plaintiff has failed to show that the damage that the 801 Building suffered was the result of sinkhole collapse as defined by the insurance policy.

**IV. Conclusion**

Based on the foregoing discussion, it is recommended that plaintiff's motion for summary judgment be DENIED and defendant's motion for summary judgment be GRANTED.

s/ William T. Prince  
William T. Prince  
United States Magistrate Judge

August 31, 2010

15